IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.

$67,000 IN U.S. CURRENCY,

          *Defendant in rem*.

NO.  3:21-CV-1788-X

**BRIEF IN SUPPORT OF UNITED STATES' MOTION FOR SUMMARY
<u>JUDGMENT</u>**

Respectfully submitted,

CHAD E. MEACHAM
UNITED STATES ATTORNEY

*/s/ Dimitri N. Rocha*
Dimitri N. Rocha
Assistant United States Attorney
Florida State Bar No. 693332
1100 Commerce Street, Third Floor
Dallas, TX 75242-1699
Telephone: 214-659-8650
Facsimile: 214-659-8803
Dimitri.Rocha@usdoj.gov

ATTORNEYS FOR PLAINTIFF

**Table of Contents**

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES................................................................................. iii

     I.     STATEMENT OF MATERIAL FACTS ........................................... 1

     II.    SUMMARY JUDGMENT STANDARD........................................ 13

     III.   ARGUMENT ................................................................................. 19

     IV.   CONCLUSION .............................................................................. 33

CERTIFICATE OF SERVICE............................................................................ 35

## Table of Authorities

**Cases**                                                                      **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................... 14

*Celotex Corp. v. Catrett*, 477 U.S. 318 (1986) ................................................... 14

*Duffie v. United States*, 600 F.3d 362 (5th Cir. 2010) .......................................... 13

*First Colony Life Ins. Co v. Sanford*, 555 F.3d 177 (5th Cir. 2009) ................................ 14

*Florida v. Harris*, 568 U.S. 237 (2013) ........................................................... 27

*Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994) .................................................... 14

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) .......................................... 14

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ......................................................... 14

*Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir. 1992) ............................................... 14

*United States v. $11,500 in U.S. Currency*, 710 F.3d 1006 (9th Cir. 2013) ..................... 18

*United States v. $18,592 of $35,037 in U.S. Currency*, 2013 WL 3095519 (N.D. Tex. June 20, 2013) .................................................................. 21, 22, 24

*United States v. $21,055 in U.S. Currency*, 778 F. Supp. 2d 1099 (D. Kan. 2011) ..... 16,18

*United States v. $37,603 in U.S. Currency*, 2021 WL 3013337 (S.D. Tex. Jul. 16, 2021) ............................................................................. passim

*United States v. $37,780*, 920 F.2d 159 (2d Cir. 1990) ........................................ 23

*United States v. $42,500.00 in U.S. Currency*, 283 F.3d 977 .............................. 18, 23, 24

*United States v. $48,100 in U.S. Currency*, 756 F.3d 650 (8th Cir. 2014) ..................... 17

*United States v. $49,576 in U.S. Currency*, 116 F.3d 425 (9th Cir. 1997) ..................... 22

*United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280 (6th Cir. 1992) ............ 19, 28

*United States v. $84,615 in U.S. Currenc*y, 379 F.3d 496 (8th Cir. 2004) ..................... 21

*UnitedStates v. $89,980 in U.S. Currency*, 2012 WL 6020041 (S.D. Tex. Nov. 9, 2012) 20

*United States v. $92,203 in U.S. Currency*, 537 F.3d 504 (5th Cir. 2008) ..................... 15

*United States v. $98,699.60 in U.S. Currency*, 2017 WL 750701 (E.D.N.C. Feb. 23, 2017) .................................................................................................... 24

*United States v. $100,000 in U.S. Currency*, 305 F. Supp. 3d 238 (D. Mass. 2018) ........ 18

*United States v. $117,920 in U.S. Currency*, 413 F.3d 826 (8th Cir. 2005) .................... 25

*United States v. $125,938.62*, 537 F.3d 1287 (11th Cir. 2008) ......................................... 17

*United States v. $129,727 in U.S. Currency*, 129 F.3d (9th Cir. 1997) ...................... 21, 24

*United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868 (10th Cir. 1992) ............. 26

*United States v. $157,808.97, More or Less, in U.S. Currency*, 309 Fed App'x 851 (5th Cir. 2009) .......................................................................................................... 15

*United States v. $159,880 in U.S. Currency*, 387 F. Supp. 2d 1000 (S.D. Iowa 2005) .... 21

*United States v. $179,000 in U.S. Currency*, 2021 WL 4497475 (M.D. La. Sept. 30, 2021) .................................................................................................................... passim

*United States v. $238,500 in U.S. Currency*, 2015 WL 1255102 (S.D. Tex. June 30, 2015) .................................................................................................................... 22

*United States v. $242,484 in U.S. Currency*, 389 F.3d 1149 (11th Cir. 2004) ................ 24

*United States v. $250,000 in U.S. Currency*, 808 F.2d 895 (1st Cir. 1987) ..................... 26

*United States v. $252,300 in U.S. Currency*, 484 F.3d 1271 (10th Cir. 2007) .......... 21, 24

*United States v. $399,101.96 more or less, in U.S. Currency*, 2013 WL 3994632 (W.D. Tex. Aug. 1, 2013) ............................................................................................... 31

*United States v. 2001 Lexus LS430*, 799 F. Supp. 2d 599 (E.D. Va. 2010) ...................... 17

*United States v. 2004 Ferrari 360 Modeno*, 544 Fed. App'x 545 (5th Cir. 2013) ........... 17

*United States v. 3148 Woodland Drive, Groves, Tex.,* 2012 WL 96617 (E.D. Tex. Mar. 1, 2012) .................................................................................................................. 16

*United States v. Fid. Inv. Acct. Ending, 742*2, 2021 WL 472929 (S.D. Ga. Feb. 9, 2021) .................................................................................................................. 16

*United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448 (7th Cir. 2005) ... 16,27

*United States v. Fuse*, 391 F.3d 924 (8th Cir. 2004) ......................................................... 22

*United States v. Herder*, 594 F.3d 352 (4th Cir. 2010) ....................................17

*United States v. Hooper*, 229 F.3d 818 (9th Cir. 2000) ...................................32

*United States v. One 1987 Mercedes 560*, 919 F.2d 327 (5th Cir. 1990) ........................18

*United States v. One Lot of U.S. Currency ($36,634)*, 103 F.3d 1048 (1st Cir. 1997) .....24

*United States v. Parcels of Prop. with Bldg. Appurtenances & Improvements Located at 255 Broadway, Hanover*, 9 F.3d 1000 (1st Cir. 1993) ..................................26

*United States v. Prop. Identified as 1813 15th Street N.W., Washington, D.C.*, 956 F. Supp. 1029 (D.D.C. 1997) ..........................................31

*United States v. Real Property Located at 148 Maunalanikai Place*, 2008 WL 3166799 (D. Haw. Aug. 6, 2008) ..........................................32

*United States v. Real Property Located at 6250 WT Montgomery Road, Bexar County, San Antonio, Texas*, No. SA:14-CV-584, 2018 WL 8261308 (W.D. Tex. Feb. 21, 2018) ......................................................15-16

*United States v. Saccoccia*, 58 F.3d 754 (1st Cir. 1995) ..................................27

*United States v. Ten Thousand Seven Hundred Dollars & No Cents in U.S. Currency*, 258 F.3d 215 (3d Cir. 2001) ..........................................21

*United States v. Two Real Properties in Bluefield*, No., 2009 WL 3181453 (S.D. W. Va. Sept. 29, 2009) ..........................................26

*Woodfield v. Bowman*, 193 F.3d 354 (5th Cir. 1999) ..........................31,32

Statutes

18 U.S.C. § 983(d)(3)(A) ..........................................31, 32

18 U.S.C. § 981(a)(1) ..........................................30

18 U.S.C. § 983 ..........................................14

18 U.S.C. § 983(c)(1) ..........................................15, 17

18 U.S.C. § 983(c)(2) ..........................................15

18 U.S.C. § 983(c)(3) ..........................................16

18 U.S.C. § 983(d) ..........................................31, 32

18 U.S.C. § 983(d)(1) ................................................................... 18, 30

18 U.S.C. § 983(d)(2)(A)............................................................. 30, 31, 32

21 U.S.C. § 881(a)(6) ................................................................ passim

21 U.S.C. § 881(h)................................................................... 15

21 U.S.C. § 801-971 ................................................................ 12

The Plaintiff United States of America ("the United States") moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment against the $67,000 in U.S. currency ("the Defendant Property"). Claimant Willando Clark ("Claimant" or "Clark") received the Defendant property in exchange for controlled substances, and intended to buy controlled substances with it.[1] And, since Clark bought and then sold controlled substances and intended to perpetuate that cycle with the Defendant property, he cannot be an "innocent owner." The evidence shows that Clark was traveling to a known source area for narcotics with a large quantity of currency; gave an implausible explanation for the currency; the currency was packaged and concealed in a manner representative of drug trafficking; Clark lacked sufficient legitimate income; a trained narcotics detection dog gave a positive alert to Clark's bag and the currency; Clark has been convicted several times for possession of marijuana and other crimes; and Clark's cell phone contained images and text communications demonstrating his recent and continuing involvement in drug trafficking of marijuana.

## I.     STATEMENT OF MATERIAL FACTS

### Procedural History and Background

On February 3, 2021, the Drug Enforcement Administration ("DEA") seized the Defendant Property from Clark at Dallas/Fort Worth International Airport ("D/FW"). Exhibit 1 ("Exh.") (Declaration of Officer Michael McBride) at App. 5, Exh. 9 (DEA

---

[1] While the Amended Complaint lists multiple forfeiture statutes, the United States is only pursuing summary judgment solely on one - 21 U.S.C. § 881(a)(6).

Seizure Documents) at App. 172-175.  On August 8, 2021, the United States filed its

Complaint against the Defendant Property.  (Dkt. 1).  On August 21, 2021, Clark filed his

Answer, and filed his verified claim to the Defendant Property on October 15, 2021.

(Dkt. 6, 12, 13).  On November 18, 2021, the United States amended its Complaint.

(Dkt. 16).  On December 15, 2021, Clark answered the Amended Complaint.  (Dkt. 18).

### Clark's February 3, 2021 travel to San Jose, California

On February 3, 2021, Clark was traveling one-way from Atlanta, Georgia to San

Jose, California on American Airlines, connecting through D/FW.  Exh 1. at App. 2,

Exh.12 (Clark's Responses to U.S. Request for Admissions) at App. 192.  Dallas DEA

Task Force Officer ("TFO") Michael McBride received a lead concerning Clark traveling

from an Atlanta DEA group.  Exh 1. at App. 2.  At that time, TFO McBride was assigned

to the DEA's High Intensity Drug Trafficking Area ("HIDTA") interdiction unit at

D/FW.  Exh. 1 at App. 1.  By February 3, 2021, TFO McBride had participated in

numerous investigations relating to the distribution of controlled substances, including

marijuana, cocaine, heroin, and other controlled substances, in violation of federal

narcotics laws.  Exh. 1 at App. 1.  Those investigations had resulted in the arrests and

convictions of individuals for violating federal drug laws, the seizure of controlled

substances, and the seizure and forfeiture of money earned from the sale of controlled

substances.  Exh. 1 at App. 1.  On February 3, 2021, TFO McBride had extensive training

concerning and experience with the aspects of narcotics investigations.  Exh. 1 at App. 1-

2.

On February 3, 2021, TFO McBride checked Clark's criminal history and learned that Clark had been previously arrested for weapons and narcotics offenses.  Exh. 1 at App. 2.  TFO McBride then contacted DEA TFO Kristopher Thompson about Clark. Exh. 1 at App. 2-3.  On February 3, 2021, TFO Thompson, along with K-9 officer "Duke," were assigned to McBride's DEA group.  Exh. 3 (Declaration of Officer Kristopher Thompson) at App. 18, 19.  TFO Thompson's experience includes investigating narcotics offenses with a K-9 officer, and TFO Thompson and K-9 "Duke" had attended and successfully completed narcotics-detection training, including detection of marijuana, cocaine, heroin, and methamphetamine.  Exh. 3 at App.18-22.  On February 3, 2021, TFO Thompson and K-9 "Duke" were accredited for narcotics-odor detection by the National Narcotics Detector Dog Association, a recognized certification training program.  Exh. 3 at App. 19.  On February 3, 2021 at D/FW, TFO Thompson brought K-9 "Duke to and "ran" the K-9 on Clark's checked bag, and K-9 "Duke" alerted to the presence of narcotic odor on or about Clark's checked bag.  Exh. 3 at App. 19.  TFO Thompson then notified TFO McBride about the K-9's positive alert to Clark's bag.  Exh. 1 at App. 3.

TFO McBride and a DEA co-worker, TFO Jesus Garcia, went to D/FW's Terminal A, Gate 11, the location for Clark's outbound flight from D/FW to San Jose, California.  Exh. 1 at App. 3.  TFO McBride knows from his experience that the San Jose, California area, and the surrounding central/northern California area, is a well-known source area for narcotics.  Exh. 1 at App. 3.  TFO McBride and TFO Garcia saw and approached Clark, identifying themselves with badges and identification.  Exh. 1 at

App. 3.  TFO McBride and TFO Garcia did not block Clark's path, but asked if they could speak with Clark about his travel; Clark agreed to speak with the TFOs.  Exh. 1 at App. 3.  TFO McBride then asked Clark for his identification and boarding pass, and Clark provided his driver's license and boarding passes, confirming his identity to the officers.  Exh. 1 at App. 3.  During this contact, TFO McBride noted that Clark was nervous in that his voice was shaky, his hands were shaking, and he failed to make eye contact with the TFOs.  Exh. 1 at App. 3.  Clark initially told the officers that he was going to San Jose for vacation, would be staying for a couple of days, and was traveling alone.  Exh. 1 at App. 3, Exh. 12 at 192-193.  Clark had purchased a one-way ticket to San Jose.  Exh. 12 at 192.  Clark told the TFOs that he had not made lodging reservations in San Jose.  Exh. 1 at App. 3, Exh. 12 at 193.  Clark did not have a carry-on bag.  Exh. 1 at App. 3, Exh. 12 at App. 193.  Clark told the TFOs that he had one checked bag and confirmed that everything in the checked bag belonged to him and that he had packed the bag.  Exh. 1 at App. 3, Exh. 12 at App. 193.  When Clark was asked if he was traveling with a large amount of U.S. or foreign currency, he stated that he had "a little bit of money to purchase a truck."  Exh. 1 at App. 4.

TFO Thompson and Irving Police Officer Bryon Rush brought Clark's checked bag to the gate where Clark and the officers were located.  Exh. 1 at App. 4, Exh. 3 at App. 19.  TFO McBride asked Clark for consent to search his checked bag, and Clark consented to the search.  Exh. 1 at App. 4, Exh. 12 at App. 193.  When the bag was opened, the officers saw clothing items inside it.  Exh. 1 at App. 4, Exh. 5 (Seizure Photos) at App. 34.  Also inside the bag were two large, shrink-wrapped/vacuum-sealed

food saver bags among the clothing.  Exh. 1 at App. 4, Exh. 5 at App. at 24-25, Exh. 12 at 194.  Each food saver bag contained bundles of U.S. currency.  Exh. 1 at App. 4, Exh. 5 at App. 24-25, Exh. 12 at App. 194.  Exhibit 5 at App. 24 shows the first bundle as it was discovered, Exhibit 5 at App. 33 shows what was seen after the first bundle was removed, and Exhibit 5 at App. 25 shows the second bundle as it was discovered.  Exh. 1 at App. 4.  Each bundle contained five rubber-banded bundles of U.S. currency.  Exh. 1 at App. 4, Exh. 12 at 194.  Based on his experience and training, TFO McBride knows that drug traffickers use vacuum-sealed bags to conceal the odor of narcotics on currency related to drug trafficking.  Exh. 1 at App. 4.  When TFO McBride asked Clark how he obtained the large amount of currency, Clark responded that he had been saving the money for years and was storing it in a safe at home.  Exh. 1 at App. 4, Exh. 12 at App. 194.

TFO McBride then asked Clark why he was traveling with the currency, and Clark responded that he was going to purchase semi-trucks in San Jose.  Exh. 1 at App. 5, Exh. 12 at App. 194.  When TFO McBride asked Clark if he had selected a vehicle, Clark responded that he had located the vehicles online.  Exh. 1 at App. 5.  When TFO McBride asked Clark to show him the vehicles on his cellular telephone, Clark responded, "well I found several dealerships online."  Exh. 1 at App. 5.  Clark admitted that he could not display pictures of any vehicles he intended to purchase, but did state that he preferred the make Volvo.  Exh. 1 at App. 5.  When TFO McBride asked Clark why he was going to purchase a truck, Clark stated that he owned a trucking business and showed TFO McBride a bank card with a business name (LLC) printed on it.  Exh. 1 at App. 5, Exh. 12 at App. 195.  When TFO McBride asked Clark why he was not going to

use the business bank account to purchase trucks, Clark did not answer.  Exh. 1 at App. 5.

TFO McBride also asked Clark why the K-9 had alerted to narcotics on his bag, Clark

responded that he did not know.  Exh. 1 at App. 5.  Clark was unable to show the TFOs

anything related to the purchase of any vehicles, any documentation on how he obtained

the currency, or any explanation on why the money was concealed in vacuum-packed

food saver bags.  Exh. 1 at App. 5.

      The TFOs noted that Clark possessed two cellular telephones.  Exh. 1 at App. 5,

Exh. 12 at App. 195.  The TFOs asked Clark whether he had any photographs or text

communications related to the purchase or sale of narcotics in his phones, and Clark

denied that he had any such photographs or communications.  Exh. 1 at App. 5.  The

TFOs seized the U.S. currency and the two phones.  Exh. 1 at App. 5, Exh. 12 at App.

195.  The total amount of seized currency was $67,000.  Exh. 1 at App. 5, Exh. 12 at

App. 194.  Following the currency's seizure, TFO Thompson "ran" K-9 "Duke" on the

currency seized from Clark, and K-9 "Duke" provided a positive alert for the presence of

an odor of narcotics on the currency.  Exh. 3 at App. 20.

### Data Extracted from Clark's Cellular Telephones

      After the February 3rd seizure of the currency, the DEA's investigation continued.

A Tarrant County judge signed a search warrant for the two telephones.  Exh. 10 (Search

Warrant) at gApp. 176-178.  A forensic download of the phones was then conducted by

TFO Norman G. Abrams, another officer assigned to the DEA group.  Exh. 2

(Declaration of Officer Norman Abrams) at App. 14-16.  When he "downloaded" Clark's

phones, TFO Abrams had extensive experience in narcotics investigations, including

experience in the analysis and evaluation of data from a variety of sources, e.g., seized documents, surveillance reports, subpoenaed telephone records, media, and internet sources.  Exh. 2 at App. 13-14.  In addition, his experience included the extraction and analyzation of voluminous cellular telephone contacts and communications, as well as digesting that information into user-friendly formats, such as forensic reports, flow charts, and organizational charts.  Exh. 2 at App. 14.  His experience also includes training with Cellebrite Reader and the Cellebrite software which extracts data from cellular telephones.  Exh. 2 at App. 14.  TFO Abrams is certified as a Cellebrite Certified Physical Analyst and Certified Cellebrite Operator.  Exh. 2 at App. 14.

During his analysis, TFO Abrams determined that one Samsung cellular telephone seized from Clark was a SM-A-215U (Galaxy A21) with telephone number 478-363-1423.  Exh. 2 at App. 15.  The other Samsung cellular telephone seized from Clark was a SM-A505U (Galaxy A50) with telephone number 706-755-9425.  Exh. 2 at App. 15.  TFO Abrams was only able to extract data from the Galaxy A50 telephone.  Exh. 2 at App. 15.  TFO Abrams conducted an initial search of the extracted data to identify images and text messages associated with drug trafficking.  Exh. 2 at App. 15.  Several images and text messages were discovered and forwarded to TFO McBride.  Exh. 1 at App. 6, Exh. 2  at App. 15.

TFO McBride is familiar with the operation of drug trafficking organizations ("DTOs") and interpreting coded language used by the traffickers involved in those organizations.  Exh. 1 at App. 2.  In the data TFO Abrams forwarded to TFO McBride, TFO McBride observed numerous photographs of large amounts of marijuana, including

photographs that zoomed to show the quality of the marijuana.  Exh. 1 at App. 6-7.  TFO

McBride identified photograph Exh. 6 (Cellular Telephone Data – Images) at App. 36,

USA91 as three glass jars of colorful marijuana, which TFO McBride noted are

somewhat rare.  Exh. 1 at App. 6.  Photograph USA92 is a photograph of a marijuana

bud.  Exh. 1 at App. 6, Exh. 6 at App. 37.  Photograph USA96 is a photograph of a hand

holding a marijuana bud.  Exh. 1 at App. 6, Exh. 6 at 39.  Photograph USA106 shows a

large brick of marijuana; USA108 and USA110 show marijuana buds; and USA107,

USA109, and USA111 are photographs of marijuana.  Exh. 1 at App. 6-7, Exh. 6 at App.

41-46.  USA105 shows a package of candy-infused Tetrahydrocannabinol ("THC")

edibles labeled as "Medicated Nerds", with the packaging resembling that of the candy

"Nerds".  Exh. 1 at App. 7, Exh. 6 at App. 40.

One photograph reviewed by TFO McBride was dated January 22, 2021 (about 10

days before the currency seizure) and showed a compressed rectangular-shaped brick of

marijuana on a digital scale displaying a weight of 15.5 ounces.  Exh. 1 at App. 7, Exh. 6

at App. 38.  TFO McBride knows from his experience and training that marijuana from

source locations such as California is often vacuum-sealed in this shape and transported.

Exh. 1 at App. 7.  In addition, TFO McBride knows that the marijuana packages are

typically 16 ounces (one pound) in weight.  Exh. 1 at App. 7.  The photograph of the

marijuana brick was sent to Clark's phone from a contact named "White Wayne."  Exh. 1

at App. 7.  TFO McBride reviewed several text messages between "White Wayne" and

Clark which showed that Clark was providing "White Wayne" with multiple-pound

quantities of marijuana.  Exh. 1 at App. 7-8, Exh. 7 (Clark Cellular Phone Text

Communications) at App. 50-91.  Hours before "White Wayne" sent the photograph of the marijuana brick to Clark, text messages show that they had met for a narcotics transaction.  Exh. 1 at App. 7-8.  TFO McBride concluded from the communications that "White Wayne" weighed the marijuana he had purchased from Clark, and "White Wayne" determined that he was owed an additional ounce of marijuana.  Exh. 1 at App. 7-8.  Particularly, "White Wayne" asked Clark "do I need to weigh the other 1," indicating that at least two pounds of marijuana were purchased from Clark.  Exh. 1 at App. 7-8.  Clark then text messaged "White Wayne" to answer the 1423 telephone number he was calling from.  Exh. 1 at App. 8.  The 1423 telephone number correlates to the Samsung Galaxy A21 telephone that was seized from Clark on February 3, 2021, and from no data could be extracted.  Exh. 2 at App. 15.  TFO McBride knows from his experience that drug traffickers often use multiple cellular telephones to separate personal communications from those involving drug trafficking.  Exh. 1 at App. 8.  In a text message dated January 26, 2021, Clark and "White Wayne" arranged a large transaction where "White Wayne" tells Clark that he has $5,000 and Clark responded that he will wait until "White Wayne" has the entire $8,000.  Exh. 1 at App. 8.

Additional text messages showing narcotics transactions were reviewed by TFO McBride.  One text conversation with an individual named "Omri", Exh. 7 at App. 92-112, showed Clark selling two pounds of marijuana.  Exh. 1 at App. 9, Exh. 7 at App. 94, 95.  In text communications with another individual, Exh. 7 at App. 113-118, Clark provided "a zip or two," a term meaning one or two ounces of marijuana.  Exh. 1 at App. 9, Exh. 7 at App. 113.  Later, the individual asked Clark for a "half," a term meaning a

half ounce of marijuana.  Exh. 1 at App. 9, Exh 7 at App. 117.  In text communications with another individual, Exh. 7 at App. 121-126, the customer asked to purchase a "half bag"  or half-ounce of marijuana from Clark.  Exh. 1 at App. 9.  In text communications with another individual believed to be one of Clark's marijuana suppliers, Exh. 7 at App. at 121-126, there are discussions about the quality of marijuana being grown.  Exh. 1 at App. 9-10.  In addition, there are discussions about how much the marijuana can be sold, including Clark stating that he can sell pounds of marijuana quickly in his city for $1,400 to $1,500 per pound.  Exh. 1 at App. 10.  In text communications with a contact saved as "Quincy", Exh. 7 at App. 127-131, Clark messaged that he has "Gelato 41", a marijuana flower/plant that has a high amount of THC.  Exh. 1 at App. 10.  In text communications with another individual, Exh. 7 at 132-App.140, Clark asked how much she was willing to pay him for marijuana.  Exh. 1 at App. 10.  In text communications with another individual identified as "June", Exh. 7 at App. 141-151, Clark asked "June" to see "properties" in California and discussed prices with her; eventually, Clark stated he wanted the price in "pounds" and compared prices to those for which marijuana was being sold in Los Angeles.  Exh. 1 at App. 10-11.  In text communications with another individual appearing to be Clark's cousin, Exh. 7 at App.152-168, Clark and this individual have a discussion about the quality of marijuana, its effect on sales, and how to improve its appearance for sales.  Exh. 1 at App. 11.

Additionally, TFO McBride reviewed two photographs of Federal Express shipping receipts downloaded from Clark's phone.  One receipt was dated December 30, 2020, and the cost of that shipment was $301.06; the cost was paid in cash.  Exh. 1 at

App. 8, Exh. 8 (FedEx Receipts and Tracking) at App. 170.  The shipment was shipped

from Chico, California to Clark's residential address in Decatur, Georgia.  Exh. 1 at App.

8; Exh. 5 at App. 28, Exh. 8 at App. 170, Exh. 11 at App. 180.  The package was

addressed to "Anthony Huff" from "Leroy Thomas."  Exh. 1 at App. 8, Exh. 8 at App.

170.  TFO McBride knows from his experience that drug traffickers will often ship

narcotics from a source area, such as California, to a recipient residential address to avoid

law enforcement detection.  Exh. 1 at App. 8.  In addition, TFO McBride knows from his

experience that individuals shipping marijuana will use fictitious names for the shipper

and recipients in the event the package is intercepted by law enforcement.  Exh. 1 at App.

8.  Indeed, through additional investigation, TFO McBride learned that this particular

package was intercepted and seized by law enforcement authorities in Georgia.  Exh. 1 at

App. 8, Exh. 4 (Declaration of Officer Freddy Saldana) at App. 23, Exh. 8 at App. 171.

Specifically, the Federal Express tracking showed that this packaged was delivered to

"POLICE SEIZE" on January 5, 2021.  Exh. 8 at App. 171.  Further, Officer Freddy

Saldana of the Gwinnett County, Georgia Police Department Narcotics Unit accessed his

department's Parcel Interdiction Database and confirmed that the package (bound for

Clark's residence) was seized by law enforcement; 2,420 grams of marijuana was inside

the package.  Exh. 4 at App. 23.  The seizure of marijuana from California to Clark's

residence occurred less than a month before the seizure of the Defendant Property here.

Concerning the second Federal Express shipping receipt found on Clark's telephone, that

package was shipped on January 4, 2021 from the same location in Chico, California and

again from "Leroy Thomas".  Exh. 8 at App. 169.  The package was addressed to "Ann

Stephens" in College Park, GA.  Exh. 8 at App. 169.  The cost of the shipment was

$146.79, paid in cash.  Exh. 8 at App. 169.

### Clark's Criminal History

Clark has been convicted for several offenses involving controlled substances.

Clark offered the following information in his discovery responses:

Responses to Requests for Admissions[2]:

Clark admitted the following:

- Admit that Claimant Willando Clark has been convicted of an offense related
  to any controlled substance listed in the Controlled Substances Act, Title 21
  United States Code Section 801-971.[3]

- Admit that Claimant Willando Clark has been convicted of possession with
  intent to distribute marijuana.

- Admit that Claimant Willando Clark has been convicted of possession of
  cocaine.

- Admit that Claimant Willando Clark has been incarcerated in the Georgia
  Department of Corrections.

Answers to Special Interrogatories[4]:

In addition to Clark's admissions, Clark provided answers, under oath, about his

criminal history, including narcotics.  Particularly, Clark has been convicted at least three

times for possession, manufacturing, and distribution of marijuana.  Clark was also

convicted at least three times for possession with intent to distribute marijuana.  In

---

[2] Claimant's Responses to Plaintiff's First Requests for Admission.  Exh. 12 at App. 196-197.
[3] Clark did clarify that "Claimant has not been convicted of any federal offenses.  He has, however, been
convicted of state offenses in Georgia for Possession of Cocaine and Marijuana."
[4] Claimant's Supplemental Answers to Plaintiff's Special Interrogatories.   Exh. 11 at App. 184-186.

addition, Clark has been convicted at least five times for possession of marijuana.  In addition, Clark has been convicted of possession of cocaine at least three times, and a violation of the Georgia Controlled Substances Act.  Clark also has a conviction for disorderly conduct/creating turmoil.

Criminal History Reports Accessed by DEA[5]:

Law enforcement accessed Clark's criminal history during their investigation. The reports confirm that Clark has been convicted of several violations involving controlled substances in Georgia, particularly marijuana, including trafficking.  In addition, Clark has other arrests and/or convictions for violent crimes.

### Clark's Income History

In Clark's answers to the United States' Special Interrogatories, Clark stated that he stated that he reported no income to the Internal Revenue Service for tax years 2017 and 2018.  For tax year 2019, Clark reported $41,791 income, and $127,344 for tax year 2020.  Exh. 11 at App. 180-181.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case."  *Duffie v. United States*, 600 F.3d

---

[5] Exh. 13.

362, 371 (5th Cir. 2010).  An issue is material if its resolution could affect the outcome of the action."  *Id.* (internal quotations omitted).  To be a genuine issue of material fact the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[T]he burden on the moving party may be discharged by 'showing' – that is, point out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 318, 325 (1986).  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

When the moving party has carried its burden under Rule 56, the burden shifts to the nonmoving party to: (a) demonstrate by competent summary judgment evidence the existence of a material fact, and (b) set forth specific facts to establish that there is a genuine issue for trial.  *See First Colony Life Ins. Co v. Sanford*, 555 F.3d 177, 180-81 (5th Cir. 2009).  The nonmoving party "may not rest upon the mere allegations or denials of his pleadings but must set forth specific facts showing that there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The nonmovant cannot create a genuine issue of material fact with "some metaphysical doubt as to the material facts," "conclusory allegations," or "by only a scintilla of evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  And the nonmoving party must do more than show that "the evidence is merely colorable" or that "there is some metaphysical doubt as to material facts."  *Anderson*, 477 U.S. at 249.  The non-

moving party is "required to identify specific evidence in the record, and to articulate the 'precise manner' in which that evidence support[s] [its] claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (citation omitted).  If the nonmoving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.  Finally, it is not the function of the court to search the record on the nonmovant's behalf for evidence which may raise a fact issue.  *See Topalian v. Ehrman*, 954 F.2d 1125, 1137 (5th Cir. 1992) ("The burden to discover a genuine issue of fact is not on this court.").  If the record, taken as a whole, could not lead a rational trier-of-fact to find the non-moving party, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475, U.S. 574, 586 (1986).

### Summary Judgment in a Civil Forfeiture Action

The Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. No. 106-185, 114 Stat. 202, codified at 18 U.S.C. § 983, governs civil forfeiture proceedings in federal court.  *See United States v. $92,203 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008). The United States bears the burden of proving by a preponderance of the evidence that the property is subject to forfeiture.  18 U.S.C. § 983(c)(1); *United States v. $157,808.97, More or Less, in U.S. Currency*, 309 Fed App'x 851, 853 (5th Cir. Feb. 6, 2009).  The United States' interest in property that is subject to civil forfeiture is deemed to vest "upon commission of the act giving rise to forfeiture."  21 U.S.C. § 881(h).

Circumstantial evidence is a permissible form of proof in a civil forfeiture case. *See United States v. Real Property Located at 6250 WT Montgomery Road, Bexar County, San Antonio, Texas*, No. SA:14-CV-584, 2018 WL 8261308 at *12 (W.D. Tex.

Feb. 21, 2018) (citing *United States v. 3148 Woodland Drive, Groves, Tex.,* No. 1:10-CV-375, 2012 WL 966117, at *6 (E.D. Tex. Mar. 1, 2012), *r&r adopted*, 2012 WL 966061.  The court should consider the "totality of the evidence as a whole and in the appropriate context" when determining whether the United States has met its burden.  *See United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 469 (7th Cir. 2005). Thus, the "aggregation of facts, each one insufficient standing alone, may suffice to meet the government's burden." *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 284 (6th Cir. 1992) (citation omitted).  To meet its burden, the government may use evidence gathered after the filing of the forfeiture complaint.  18 U.S.C. § 983(c)(2).

With this motion, the United States seeks forfeiture pursuant to 21 U.S.C. § 881(a)(6), which provides for the forfeiture of property that represents (1) money furnished or intended to be furnished in exchange for a controlled substance, (2) proceeds traceable to such exchange, or (3) money used or intended to be used to facilitate a violation of Title 21.  In this case, the evidence shows a cycle of activity in which Clark sold narcotics in Georgia for money and then would use that money to buy more narcotics from California and other states to again sell.  The Defendant Property is subject to forfeiture because it is money intended to be furnished in exchange for a controlled substance and/or intended to be used to facilitate a violation of Title 21, i.e., "purchase money."  In addition, the Defendant Property is subject to forfeiture because it was earned from an exchange of controlled substances, i.e., proceeds from Clark selling marijuana.

When the United States seeks forfeiture for property that was used or intended to be used to facilitate the commission of a Title 21 violation, the government bears the burden to establish a "substantial connection" between the property and the offense in question. *See* 18 U.S.C. § 983(c)(3); *see, e.g, United States v. $48,100 in U.S. Currency*, 756 F.3d 650, 653 (8th Cir. 2014) (applying substantial connection test to money "used to facilitate any drug trafficking crime" under 881(a)(6); *United States v. $125,938.62*, 537 F.3d 1287, 1293 n.2 (11th Cir. 2008) (substantial connection requirement only applies in facilitation cases; it does not apply where the government's theory is proceeds). A "substantial connection" can be proven with direct or circumstantial evidence. *See United States v. 2004 Ferrari 360 Modeno*, 544 Fed. App'x 545, 545 (5th Cir. 2013). The substantial connection test is not a high burden. *See United States v. Herder*, 594 F.3d 352, 364-65 (4th Cir. 2010) (substantial connection test is satisfied by showing that the property made the offense less difficult to commit, or more or less free from obstruction or hindrance); *United States v. Fid. Inv. Acct. Ending 7422*, No. 16-CV-20, 2021 WL 472929 (S.D. Ga. Feb. 9, 2021) (government has to establish the substantial connection between the money and offense by a preponderance of the evidence and that the money was related to some illegal drug transaction, but the government need not prove that the money is traceable to a specific drug transaction); *United States v. 2001 Lexus LS430*, 799 F. Supp. 2d 599, 602-608 (E.D. Va. 2010) (facilitating the illegal act does not have to be the property's primary purpose; there is a substantial connection if the property made the crime less difficult and more or less free from obstruction or hindrance).

To meet the preponderance standard, the United States is not required to connect the seized property to a specific drug transaction or show the existence of a criminal conviction or an indictment of a drug related offense.  *See, e.g., United States v. One 1987 Mercedes 560*, 919 F.2d 327, 331 (5th Cir. 1990); *United States v. $21,055 in U.S. Currency*, 778 F. Supp. 2d 1099, 1104 (D. Kan. 2011) (when the United States alleges proceeds of drug trafficking it "need only trace . . . to drug trafficking generally, not to a specific transaction").  The United States is required to show, based on the totality of the circumstances, that there is a connection between the currency and drug-related activity by a preponderance of the evidence.  *See* 18 U.S.C. § 983(c)(1); *United States v. $11,500 in U.S. Currency*, 710 F.3d 1006, 1013 (9th Cir. 2013) ("in a civil forfeiture action, the government bears the burden of proving by a preponderance of the evidence that the property is subject to forfeiture . . . The government may meet its burden with sufficiently strong circumstantial evidence linking the currency to drug trafficking in general.").

Regarding property subject to forfeiture under 21 U.S.C. § 881(a)(6), "[a]s a general proposition, "[t]he usual evidence in a currency seizure case is a drug sniff, a quantity of currency, an unusual manner of packaging and the claimant's implausible story, which is together sufficient to meet the government's preponderance standard." *United States v. $100,000 in U.S. Currency*, 305 F. Supp. 3d 238, 246 (D. Mass. 2018) (quoting *$21,055.00 in U.S. Currency*, 778 F. Supp. 2d at 1104 (*quoting United States v. $42,500.00 in U.S. Currency*, 283 F.3d 977, 984, n. 1 (9th Cir. 2002)).  "The aggregation of [these] facts, each one insufficient standing alone, may suffice to meet the

government's burden." *Id.* (quoting *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 284 (6th Cir. 1992)).

Once the United States had demonstrated its case, the burden then shifts to the claimant to demonstrate, by a preponderance of the evidence, that the claimant is an "innocent owner" of the property. *See* 18 U.S.C. § 983(d)(1).

## III.   <u>ARGUMENT</u>

### <u>The Defendant Property is Forfeitable Pursuant to 21 U.S.C. § 881(a)(6)</u>

The Defendant Property – the money that Clark was transporting in his bag through D/FW - is subject to forfeiture.  Based on the undisputed material facts and totality of the circumstances in this case, the Defendant Property was furnished or intended to be furnished in exchange for a controlled substance, is proceeds traceable to such exchange, or was used or intended to be used to facilitate a violation of Title 21. Clark was traveling to a known source area for narcotics with a large quantity of currency; gave an implausible explanation for the currency; the currency was packaged and concealed in a manner representative of drug trafficking; Clark lacked sufficient legitimate income; a trained narcotics detection dog gave a positive alert to Clark's bag and the currency; Clark has been convicted several times for possession of marijuana and other crimes; and Clark's cell phone contained images and text communications demonstrating his recent and continuing involvement in drug trafficking of marijuana. These undisputed material facts are consistent with factual circumstances in which courts routinely grant summary judgment in favor of the government.  *See, e.g., United States v. $179,000 in U.S. Currency*, No. 18-CV-664, 2021 WL 4497475 (M.D. La. Sept. 30,

2021) (granting summary judgment where: (1) claimant had a criminal history of drug activity; (2) claimant's possession of large amounts of currency at the time of his drug trafficking; (3) that the currency was packaged and stored in $100 bills rubbered-banded together in a safe deposits box; and (4) lack of legitimate source of income); *United States v. $238,500 in U.S. Currency*, No. 4:14-CV-3353, 2015 WL 12551092 (S.D. Tex. June 30, 2015) (granting summary judgment where: (1) claimant had a criminal narcotics history; (2) narcotics canine alerted to the odor of narcotics; (3) large amount of currency; (4) claimant's implausible explanation as to the source of the currency); *United States v. $89,980 in U.S. Currency*, No. 4:11-CV-309, 2012 WL 6020041 (S.D. Tex. Nov. 9, 2012) (granting summary judgment where: (1) the money was concealed in the vehicle and vacuum-sealed and wrapped in tape; (2) the vehicle traveled to a source area for narcotics; (3) a trained narcotics canine alerted to the odor of narcotics; (4) the claimant presented inconsistent statements and nervous demeanor to law enforcement; and (5) the claimant could not establish a legitimate source for the money).[6]

> **Clark's travel to a known source area, quantity of currency, implausible explanation regarding the Defendant Property, and nervous demeanor are highly probative of illegal narcotics activity.**

Clark was traveling to San Jose, California.  The central/northern California area, including San Jose, California, is a well-known source area for narcotics, which is highly probative of drug trafficking.  Exh. 1 at App. 3.   Indeed, the DEA at Atlanta sent a tip to

---

[6] *See also, United States v. $37,603 in U.S. Currency*, No. 4:20-CV-222, 2021 WL 3013337 (S.D. Tex. Jul. 16, 2021) (granting default judgment where: (1) claimant was traveling with a large amount of currency; (2) claimant concealed the currency: (3) claimant did not link the currency to legitimate income; (4) narcotics canine officer alerted to the currency; and (5) claimant's narcotics criminal history.

DEA D/FW Airport alerting them about Clark's travel.  Exh. 1 at App. 2.  Clark's

conduct, i.e., transporting concealed currency and traveling back and forth to a known

narcotics source area is consistent with that of a drug courier seeking to purchase

narcotics.  Courts often consider whether a claimant has served in the capacity of a "drug

courier" when determining whether the seized property is connected to illegal drug

activity.  *See United States v. $129,727 in U.S. Currency*, 129 F.3d at 490-91 (9th Cir.

1997) (court finding that claimant's actions were consistent with a drug courier profile,

where claimant's baggage contained large amount of currency and wrapped in fabric

softener sheets and plastic wrap); *United States v. Ten Thousand Seven Hundred Dollars*

*& No Cents in U.S. Currency*, 258 F.3d 215, 227 (3d Cir. 2001)).

Clark's possession of a large quantity of cash - $67,000 - is also probative of drug

trafficking.  *See, e.g., United States v. $37,603 in U.S. Currency*, 2021 WL 3013337, at

*5 (S.D. Tex. Jul. 16, 2021) (traveling with a large amount of currency strongly suggests

a connection to a crime related to controlled substances) (citing *United States v. $18,592*

*of $35,037 in U.S. Currency*, No. 3:12-CV-1134-M, 2013 WL 3095519, at *3 (N.D. Tex.

June 20, 2013) (citing *United States v. $159,880 in U.S. Currency*, 387 F. Supp. 2d 1000,

1013 (S.D. Iowa 2005)); *United States v. One Hundred Seventy-Nine Dollars in U.S.*

*Currency*, 2021 WL, 4497475, at *7 (M.D. La. Sept. 30, 2021) (possession of large sums

of cash at the time of claimant's engagement in drug activity provides strong evidence

that the cash is connected to drug activity) (quoting *United States v. $84,615 in U.S.*

*Currency*, 379 F.3d 496, 501-02 (8th Cir. 2004); *see also United States v. $252,300 in*

*U.S. Currency*, 484 F.3d 1271, 1275 (10th Cir. 2007) ("A large amount of currency,

while not alone sufficient to establish a connection to a drug transaction, is 'strong evidence' of such a connection.)).  In addition, Clark's explanation that he was transporting the currency to purchase vehicles for his trucking company is implausible.  It is  implausible that someone who is purchasing trucks for his business would travel with a large amount of cash (concealed in vacuum-sealed bags) when that business had a business bank account.  Indeed, Clark showed the officers that he had a business bank card in his possession at the time of the seizure.  Exh. 1 at App. 5.   The large amount of currency and Clark's implausible explanation is strong evidence that the Defendant Property is subject to forfeiture pursuant to Section 881(a)(6).

Finally, TFO McBride observed Clark's unusual nervous behavior once he approached Clark.  Specifically, TFO McBride observed that Clark appeared to be nervous because Clark's voice was shaky, his hands were shaking, and Clark would not make eye contact.  Exh. 1 at App 3.  A claimant's nervous behavior is probative that he was engaged in drug trafficking.  *See United States v. $18,592 of $35,037 in U.S. Currency,* 2013 WL 3095519, at *3 (N.D. Tex. June 20, 2013) (claimant's nervous behavior during traffic stop – that his hands were sweaty and shaky and his voice was quivering – weighs in favor of finding a substantial connection between the seized money and illegal drug activity) (citing *United States v. Fuse,* 391 F.3d 924, 929 (8th Cir. 2004));  *United States v. $49,576 in U.S. Currency,* 116 F.3d 425, 428 (9th Cir. 1997) ("[Claimant's] general nervous behavior [is] indicative of some illegal activity.").  Clark's nervous behavior and demeanor on February 3, 2021 are further evidence supporting the Defendant Property's forfeiture.

**The manner in which the Defendant Property was concealed is consistent with drug trafficking.**

Second, the way Clark attempted to conceal and transport the Defendant Property is indicative of illegal drug activity, i.e., Clark taking the money to California to be furnished or intended to be furnished to purchase marijuana or otherwise facilitate a violation of Title 21.  The Defendant Property was concealed among Clark's clothing in his checked bag.  Most importantly, the currency was contained inside shrink-wrapped, vacuum-sealed food-saver bags.  Exh. 1 at App. 4, Exh. 5 at App. 24-25.  TFO McBride knows from his training and experience that drug traffickers will vacuum seal currency in food-saver bags to conceal the narcotics odor.  Exh. 1 at App. 4.

The way Clark concealed the Defendant Property went well beyond what a law-abiding individual would have done, and accordingly, the unusual manner in which the Defendant Property was packaged is highly probative of illegally narcotics activity.  *See $42,500 in U.S. Currency*, 283 F.3d at 982 ("Unlike a purse or money pouch, cellophane is not a normal repository for carrying large amounts of money"); *United States v. $37,780*, 920 F.2d 159, 163 (2d Cir. 1990) ("[the claimant' was carrying an extremely large sum of cash [$37,780] in small denominations, demonstrating that he was either inordinately carefree with his money or was involved in illegal activity."). While Clark claimed that he was transporting the currency to purchase trucks for business, it is implausible that someone would conceal $67,000 in rubber-banded currency in vacuum-sealed food-saver bags hidden in clothing in a checked-bag for the purposes of legitimate business, particularly when the business has a bank account.  *See United States v. One*

*Hundred Seventy-Nine Thousand Dollars in U.S. Currency*, 2021 WL 4497475, at *7
(M.D. La. Sept. 30, 2021) ("the very nature of the manner in which the Defendant
Currency was packaged and stored (179,000 in $100 bills rubber-banded together in a
safe deposit box) has significant probative value with respect to whether the Defendant
Currency is indicative of drug proceeds") (citing *United States v. $242,484 in U.S.
Currency*, 389 F.3d 1149, 1161-62 (11th Cir. 2004) ("A common sense reality of
everyday life is that legitimate businesses do not transport large quantities of cash rubber-
banded into bundles and stuff into packages in a backpack.")).

Indeed, possession of a large amount of currency packaged in an unusual way is
strong evidence that the money "was furnished or [is] intended to be furnished in return
for drugs." *United States v. $42,500 in U.S. Currency,* 283 F.3d 977, 981 (9th Cir. 2002)
(concluding that $42,500 wrapped in cellophane is a large sum of money packaged in
such a way to suggest illegal activity); *see also United States v. One Lot of U.S. Currency
($36,634)*, 103 F.3d 1048, 1056 (1st Cir. 1997) (finding $36,634 is an "extremely large
sum of cash"); *rev'd on other grounds*.  Courts have consistently held that the method
and manner of packaging and transporting currency is probative when determining a
connection between seized property and its nexus to drug trafficking.[7]  The manner and

---

[7] *See, e.g, United States v. $98,699.60 in U.S. Currency*, No. 5:13-CV-585, 2017 WL 750701, at *16
(E.D.N.C. Feb. 23, 2017) (collecting cases where courts have "relied on the quantity of currency and the
manner in which it was bundled as factors supporting the entry of judgment for the government in civil-
forfeiture cases"); *United States v. $252,300 in U.S. Currency*, 484 F.3d 1271, 1274-75 (10th Cir. 2007)
(court considered quantity of seized currency and the manner and method of packaging with rubber bands
in plastic bags as probative evidence that it was connected to drug trafficking); *United States v. $129,727
in U.S. Currency*, 129 F.3d 486, 491 (9th Cir. 1997) ("the nexus to drugs was provided by the distinctive
manner in which the currency was wrapped in fabric softener sheets and plastic wrap.  The narcotics
detail recognized this wrapping as an indication of drug-related activity . . . .  Given the strong nexus to

packaging that the Defendant Property was transported – in a manner to deceive law enforcement detection – is probative of the Defendant Property's nexus to drug trafficking and that it was going to be furnished in exchange for controlled substances.

**Clark's lack of income is consistent with drug trafficking.**

Third, Clark's lack of legitimate income is relevant and probative of the Defendant Property's nexus with drug trafficking. As an initial matter, Clark's lack of legitimate income is probative that the Defendant Property proceeds from the sales of narcotics given the large amount of currency. In addition, Clark's lack of income is probative evidence that he furnished, or intended to furnish, the Defendant Property in exchange for a controlled substance – marijuana. In Clark's interrogatory answers, Clark stated that he did not report any income to the taxing authorities in 2017 or 2018; he did report $41,791 for 2019, and $127,344 for 2020. Exh. 11 at App. 180-181. Given Clark's reported income, Clark was carrying on his nearly 40% of the total income he had reported the previous four years on a cross-country flight (in a checked bag). And as previously noted, it is implausible for Clark to travel with a large amount of currency for his business when he has a business bank account. Moreover, based on the Claimant's limited income and employment history, it is implausible for the Claimant to have accumulated the Defendant Property in savings. Courts have considered such evidence

---

drug activity provided by the distinctive manner in which the currency was wrapped and the totality of circumstances at the time the carry-on bag was opened, we hold that 'a prudent person with the officers combined experience in narcotics investigations would conclude that [the claimant] was involved in illegal drug transactions."); *United States v. $117,920 in U.S. Currency*, 413 F.3d 826, 829 (8th Cir. 2005) (seized currency "bundled in rubber bands, enclosed within a plastic sack, and hidden beneath clothing in a duffle bag" taken together with other evidence was sufficient to satisfy government's burden for forfeiture).

as probative of whether the seized property bears a nexus to illegal narcotics activity. *See, e.g, United States v. One Hundred Seventy-Nine Thousand Dollars*, 2021 WL 4497475, at *7 (M.D. La. Sept. 30, 2021) (absence of apparent, verifiable, or legitimate source of substantial income is probative evidence of a substantial connection to illegal activity); *United States v. $37,603 in U.S. Currency*, 2021 WL 3013337, at *5 (S.D. Tex. Jul. 16, 2021) (claimant's failure to link the Defendant currency to any legitimate source of income supports an inference that it is connected to a crime related to controlled substances); *United States v. Two Real Properties in Bluefield*, No. 06-CV-0532, 2009 WL 3181453 (S.D. W. Va. Sept. 29, 2009) ("[F]actors that weigh in favor of property being either a direct product of illicit drug activity or traceable to the activity as proceeds include "where a defendant's verifiable income cannot possibly account for the level of wealth displayed and where this is strong evidence that the defendant is a drug trafficker.").[8]  Based on Clark's income history, there is no plausible way that he could have saved $67,000.  Clark has not provided anything more than conclusory statements regarding his ownership of the Defendant Property and has not shown that it was derived from legitimate sources.  Because Clark is unable to do so, summary judgment is appropriate.

---

[8] *See also United States v. Parcels of Prop. with Bldg. Appurtenances & Improvements Located at 255 Broadway, Hanover*, 9 F.3d 1000, 1005 (1st Cir. 1993), *rev'd on other grounds* ("We conclude that claimants' proffer of three 'possible' innocent sources of income does not vitiate the government's showing of a strong probability that the source of the money is in fact illegal drug activity") (quoting *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 878 (10th Cir. 1992)); *United States v. $250,000 in U.S. Currency*, 808 F.2d 895, 899 (1st Cir. 1987) ("The absence of any apparent legitimate sources for the $250,000 suggests that the money is derived from drug transactions.").

**The certified narcotics dog positive alert is further probative evidence that the Defendant Property is involved in drug trafficking.**

A canine positive alert is further probative evidence that the Defendant Property is proceeds of narcotics, as well as its use or intended use to be furnished in exchange for a controlled substance.  Here, a trained narcotics K-9, "Duke", accompanied by handler TFO Thompson, positively alerted to the presence of narcotics odor on or about Clark's bag and the Defendant Property.  Exh. 3 at App. 18-22.  Based on TFO Thompson's (and his K-9's) level of training in the field of narcotics odor detection, the positive alter is reliable.

Courts have held that a trained and certified narcotics dog's positive alert to currency is probative evidence that the currency is connected to illegal narcotics activity. *See, e.g., United States v. $37,603 in U.S. Currency*, 2021 WL 3013337, at *5 (S.D. Tex. Jul. 16, 2021) (citing *United States v. $18,592 of $35,037 in U.S. Currency*, 2013 WL 3095519, at *4 (N.D. Tex. June 30, 2013) (trained canine alerted to the odor of controlled substances inside box where money was found supports a substantial connection between the money and drug trafficking)).  In *Florida v. Harris*, the Supreme Court held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert.").  568 U.S. 237, 246 (2013); *see also United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 462 (7th Cir. 2005) (a positive alert by a trained drug dog is entitled to probative weight); *United States v. Saccoccia*, 58 F.3d 754, 777 (1st Cir. 1995) (positive canine alert to currency is entitled to some probative evidence of illegal activity).

**Clark's criminal history is probative of drug trafficking.**

The Claimant's criminal history is very relevant.  In civil forfeiture cases, courts often consider prior offense conduct, especially if the claimant has a record that includes prior drug related offenses.  *See, e.g., United States v. One Hundred Seventy-Nine Thousand Dollars*, 2021 WL 4497475, at *6 (M.D. La. Sept. 30, 2021) ("A claimant's record of drug activity is highly probative factor in the forfeiture calculus.") (quoting *United States v. $67,220 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir. 1992)); *United States v. $37,603 in U.S. Currency*, 2021 WL 3013337, at *5 (S.D. Tex. Jul. 16, 2021) (claimant's criminal history of drug possession supports a connection between the defendant property and a crime related to controlled substances).

Clark has an extensive history of arrests and convictions for narcotics-related and other offenses.  Clark admitted to his extensive criminal history in his answers to interrogatories and requests for admissions.  Exh. 11 at App. 184-186, Exh. 12 at 196-197.  In addition, the DEA accessed Clark's criminal history during its investigation; the records reflect arrests and/or convictions for obstruction, multiple sales of marijuana, possession with intent to distribute controlled substances, trafficking illegal drugs, fleeing an officer, carrying a pistol without a license, loitering for sex, home invasion, cruelty to children, and possession of firearm by a felon.  Exh. 13.  Since the issue here is whether the Defendant Property is properly connected to drug trafficking, Clark's past arrests and convictions for possessing and distributing narcotics (especially marijuana) are probative in the analysis.  This evidence supports that the Defendant Property was furnished or intended to be furnished in exchange for a controlled substance and that it was also

proceeds of a violation of Title 21.

> **Cellular telephone data downloaded from Clark's phone shows text communications and images of Clark's involvement of drug trafficking.**

The cellular telephone seized from Clark contained several text communications and images demonstrating the "ins and outs" of buying and selling marijuana and this material further connects the Defendant Property to a crime related to controlled substances. *See United States v. $37,603 in U.S. Currency*, 2021 WL 3013337, at *5 (S.D. Tex. Jul. 16, 2021) (claimant's criminal history of drug possession supports a connection between the defendant property and a crime related to controlled substances).

Particularly, there are multiple images of marijuana on the cellular telephone that focusing on the marijuana's quality. Exh. 6 at App. 36, 37, 39-46. Another photograph shows marijuana brick placed on a scale and weighing 15.5 ounces. Exh. 6 at App. 38. This photograph relates to a text message that "White Wayne" sent to Clark complaining about the weight of the marijuana that had been sold to him. Exh. 1 at App. 7-8. These communications happened weeks before Clark traveled to California with the Defendant Property. Moreover, there are voluminous text communications with several individuals about buying or selling marijuana, including price, quantity, and quality of the drugs. Exh. 7 at App. 92-168. Indeed, one of the conversations shows Clark communicating with someone about the quality and price of marijuana in California, which is where Clark was traveling on February 3, 2021. Exh. 7 at App. 141-151. This evidence is strong evidence that Clark was going to travel to California to purchase narcotics with the Defendant Property.

One of the most salient pieces of evidence connecting the Defendant Property to drug trafficking is that package destined for Clark's residence was seized by law enforcement due to narcotics.  Exh. 4 at App. 23.  Approximately one month prior to the seizure in this case, a package with 2,420 grams of marijuana destined for Clark's residence from California was intercepted by law enforcement in Georgia and seized. Exh. 4 at App. 23.  The data extracted from Clark's cellular telephone showed images of two Federal Express shipping receipts from Chico, California to Georgia.  Both shipments were sent by a "Leroy Thomas", and one of the shipments was addressed to a "Anthony Huff" at Clark's residential address in Decatur, GA.  Exh. 1 at 8, Exh. 8 at App. 169, 171.  TFO McBride stated that in his experience, drug traffickers will use fictitious names when shipping packages of narcotics.   Exh. 1 at App. 8.  The shipment to Clark's residence was paid in cash with a shipping cost of $301.06.  Exh. 1 at App.8, Exh. 8 at App. 170.  The package to Clark's residence was intercepted by law enforcement and not delivered.  Exh. 4 at App. 23, Exh. 8 at App. 171.  The Gwinnett County, Georgia Police Department stated that the package addressed to Clark's residence contained 2,420 grams of marijuana.  Exh. 4 at App 23.   In sum, the voluminous data extracted from the cellular telephone seized from Clark shows extensive drug trafficking and is further probative of the Defendant Property was used or intended to be used to facilitate a violation of Title 21.

**Clark does not qualify as an innocent owner under 18 U.S.C. § 983(d).**

Considering the totality of the circumstances, the United States has met its burden to establish, by a preponderance of the evidence, that there is a substantial connection

between the Defendant Property and illegal narcotics activity.  Once the United States has

shown that any Defendant Property is subject to forfeiture, the burden shifts to the

Claimant to establish, by a preponderance of the evidence, that he is an "innocent owner"

and her interest in any Defendant Property is therefore, not subject to forfeiture.  18

U.S.C. § 983(d)(1).  Pursuant to 18 U.S.C. § 983(d)(2)(A), a claimant is an innocent

owner if he can demonstrate either that he did not know of conduct giving rise to

forfeiture or did all that he reasonably could upon learning of unlawful conduct to

terminate such use of the property.  "In general, this defense operates such that an owner

who acted in good faith and had no knowledge of the conduct giving rise to the forfeiture

will not have to forfeit property that would otherwise be subject to forfeiture under 18

U.S.C. § 981(a)(1)."  *United States v. $399,101.96 more or less, in U.S. Currency*, 2013

WL 3994632, at *5 (W.D. Tex. Aug. 1, 2013).

     First, as a procedural matter, Clark is foreclosed from using the innocent owner

defense because he did not affirmatively plead this defense in his Answer.  The innocent

owner is an affirmative defense that must be pleaded in the Answer to the Verified

Complaint.  *See United States v. Prop. Identified as 1813 15th Street N.W., Washington,

D.C.*, 956 F. Supp. 1029, 1035 (D.D.C. 1997) (The "innocent owner" defense is an

affirmative defense that must be proven by the claimant).  The purpose of the Answer is

to provide the Court and the United States with the claims and defenses which support

the claim to the Defendant Property.  *See Woodfield v. Bowman*, 193 F.3d 354, 362 (5th

Cir. 1999) (the defendant must plead an affirmative defense with enough specificity or

factual particularity to give the plaintiff "fair notice" of the defense that is being

advanced).  Because Clark did not plead this affirmative defense, it has been waived. *See*

*Woodfield*, 193 F.3d at 363 (affirming district court's order that the party waived the right

to assert an affirmative defense by not pleading it).

Even if Clark did affirmatively plead the innocent owner defense in his Answer,

he would not prevail.  A claimant shows innocent ownership in two ways that hinge on

when the alleged interest was acquired.  A claimant is an innocent owner if he had an

interest in the property before it became forfeitable, and he can demonstrate either that he

did not know of conduct giving rise to forfeiture or did all that he reasonably could upon

learning of the illegal conduct to terminate such use of the property.  18 U.S.C. §

983(d)(2)(A).  A claimant may also be an innocent owner of property acquired after it

became forfeitable if he is a bona fide purchaser for value and he has no reasonable cause

to believe that the property was subject to forfeiture.  18 U.S.C. § 983(d)(3)(A).  Clark

cannot meet the statutory definition of innocent owner.

Particularly, pursuant to 18 U.S.C. § 983(d), a claimant must establish their

innocence in the unlawful activity giving rise to forfeiture.  A claimant whose own acts

give rise to forfeiture cannot show that he "did  not know of the conduct giving rise to the

forfeiture under 18 U.S.C. § 983(d)(2)(A).  Here, the Claimant cannot prevail as an

innocent owner because his own conduct caused the Defendant Property to be subject to

forfeiture.  Far from taking affirmative steps to put an end to the unlawful activity giving

rise to forfeiture of the defendant property, Clark knowingly engaged in the criminal

conduct detained in this motion and its exhibits.  Section 983(d)(2)(A) also states that to

qualify as an innocent owner, the property interest must exist "at the time the illegal

conduct giving rise to forfeiture took place."  Since criminal proceeds result from illegal conduct, they inherently cannot exist prior to that illegal conduct.  *See United States v. Hooper*, 229 F.3d 818, 822 (9th Cir. 2000) (an interest in criminal proceeds is necessarily acquired after the offense).  Thus, a claimant can never "own" illegal proceeds, or property purchased with illegal proceeds, under 18 U.S.C. § 983(d)(2)(A).  *See United States v. Real Property Located at 148 Maunalanikai Place*, 2008 WL 3166799, at *10 (D. Haw. Aug. 6, 2008).

Likewise, Clark cannot meet the definition of an innocent owner under 18 U.S.C. § 983(d)(3)(A) for property interests acquired after the conduct giving rise to forfeiture took place.  At all relevant times, the Defendant Property either represented money furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such exchange, or money used or intended to be used to facilitate a violation of Title 21.  This unlawful activity giving rise to forfeiture continued up to the date of the seizure.  Therefore, the United States is entitled to summary judgment because Clark is not an innocent owner.

IV.    **CONCLUSION**

The United States asks the court to grant a summary judgment of forfeiture pursuant to 21 U.S.C. § 881(a)(6) because the undisputed material facts demonstrate by a preponderance of the evidence that the Defendant Property was furnished or intended to be furnished in exchange for a controlled substance and proceeds of a violation of Title 21.  In addition, the Defendant Property was substantially connected to illegal drug trafficking.  Clark intended to use Defendant Property to buy marijuana in California that

had been earned through Clark selling marijuana in Georgia.

Respectfully submitted,

CHAD E. MEACHAM
UNITED STATES ATTORNEY

*/s/ Dimitri N. Rocha*
Dimitri N. Rocha
Assistant United States Attorney
Florida State Bar No. 693332
1100 Commerce Street, Third Floor
Dallas, TX 75242-1699
Telephone: 214-659-8650
Facsimile: 214-659-8803
Dimitri.Rocha@usdoj.gov

ATTORNEY FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 5, 2022, I electronically filed the foregoing Plaintiff United States of America's Brief in Support of its Motion for Summary Judgment using the electronic case filing system of the Court.  This filing provided electronic notice of this document to counsel of record:

CHAD E. MEACHAM
UNITED STATES ATTORNEY

*/s/ Dimitri N. Rocha*
Dimitri N. Rocha
Assistant United States Attorney

**United States' Brief in Support of its Motion for Summary Judgment- Page 35**