IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br>v.<br><br>$67,000 IN U.S. CURRENCY,<br><br>      *Defendant in rem*. | NO.  3:21-CV-1788-X |

## DECLARATION OF OFFICER MICHAEL MCBRIDE

  I, Michael McBride, submit this declaration in support of the United States' Motion for Summary Judgment.

  I am currently an Irving Police Officer in the Patrol Unit.  I was assigned to the Drug Enforcement Administration High Intensity Drug Trafficking Area (HIDTA) interdiction unit from 2018 through February 2022.  I began my law enforcement career in 2004 with the Irving Police Patrol Unit.  In 2012, I was assigned to the Irving Police Department Undercover Narcotics Unit.  In 2018, I joined the DEA's HIDTA interdiction unit and served in that role until February 2022.

  During my employment as an Irving police officer and Task Force Officer assigned to DEA's HIDTA interdiction unit, I have participated in numerous investigations relating to the distribution of controlled substances, including marijuana, cocaine, heroin, and other substances in violation of the federal anti-drug laws.  Those investigations have resulted in arrests and convictions for violations of drug laws, the seizure of drugs, laundering of narcotics proceeds, and forfeiture of money and property.  I am also familiar with the means and methods involved in narcotics distribution, including the use of drug trafficking organizations and the interpretation

App._0001

of coded language by narcotics traffickers. I have also attended narcotics training conferences, as well as various other narcotics and general law training courses pertaining to narcotics interdiction. Though my training and experience, I am knowledgeable about all aspects of drug trafficking organizations (DTOs), including, but not limited to, the organizational structure DTOs, the methods utilized to transport drugs and/or drug proceeds, the methods used by DTOs to distribute drugs and collect drug proceeds, the methods of communication utilized by DTOs, including the use of cellular telephones and coded language, and the financial and accounting practices of DTOs, including the matter in which drugs are priced for distribution, use of coded drug ledgers the methods of payment for DTO members, and the methods utilized by DTOs to launder drug proceeds, including the practice of utilizing bulk cash smuggling.

On February 3, 2021, I was assigned to Dallas Fort Worth International Airport. That morning, I was contacted by DEA Atlanta Interdiction regarding suspicious travel by passenger Willando Clark who was traveling from Atlanta International Airport to San Jose, California, stopping in Dallas/Fort Worth International Airport. Willando Clark was on American Airlines flight 1567 from Atlanta, GA to DFW Airport, TX. Clark's flight from DFW Airport, TX to San Jose, CA was on American Airlines 1916. Clark was scheduled to arrive at approximately 9:08a.m. at Terminal A, Gate 35, and he was scheduled to depart from DFW Airport, TX to San Jose, CA at approximately 10:23a.m. at Terminal A, Gate 11. I conducted a criminal history check on Clark, which revealed he had been arrested previously for weapons and narcotics offenses.

I, along with Task Force Officer Jesus Garcia responded to Terminal A, Gate 11, TFO Garcia and I observed Clark walking in the area of Gate 11. I contacted TFO Kristopher Thompson about Clark, and TFO Thompson located Clark's checked-bag when it was being unloaded from

the arriving Atlanta flight. I spoke with TFO Thompson by telephone and he told me that he had utilized his K-9 "Duke", a certified narcotics dog, and received a positive alert to the presence of narcotics order on or about Clark's checked bag. Then, TFO Garcia and I approached Clark and identified ourselves with our badges and identification. TFO Garcia and I did not block Clark's path and we asked if we could speak to Clark about his travel. Clark agreed to speak with TFO Garcia and I. During this consensual conversation with Clark, I asked to see Clark's boarding pass and identification. TFO Garcia and I confirmed Clark's identify and trip schedule. Photographs were taken of Clark's driver's license and boarding passes. App. 28-30, (USA 97, USA 98, USA 99). In addition, a photograph was later taken of Clark. App. 27, (USA95). Clark appeared to be nervous as his voice was shaky, his hands were shaking, and he would not make eye contact. I know from my experience that drug traffickers present nervous demeanor and actions when confronted by law enforcement, such as the demeanor presented by Clark. Clark stated that he was traveling to San Jose, CA for vacation, that he would be staying for a couple of days, and that he was traveling alone. Clark stated that he did not have lodging reservations, and that he would find a place after he arrived in San Jose. I also know from my experience and training that drug traffickers often purchase one-way airline tickets to source areas (such as Clark here), particularly California, and often do not have planned reservations for their travel such as lodging or transportation. The San Jose, California area, and the surrounding central/northern California area, is a well-known source area for narcotics, and people travel to that area from around to country to obtain narcotics for drug trafficking.

 I observed that Clark did not have any carry-on bags, but Clark stated that he had one checked-bag. I asked Clark if everything in his checked-bag belonged to him, and Clark confirmed. In addition, I asked Clark if he had packed his own bag, and Clark confirmed. I

3

asked Clark if he was traveling with any guns, weapons, and/or drugs, and Clark replied no. I then asked Clark if he was traveling with large amounts of U.S. or foreign currency and Clark stated that he "had a little bit of money to buy a truck." I asked Clark for consent to search his bag, and Clark gave verbal consent. This exchange was witnessed by TFO Garcia.

TFO Thompson and Irving Police Officer Bryon Rush brought Clark's checked bag to the gate where we were located. I asked Clark for consent to search his checked-bag, and Clark consented to the search. A photograph was taken of the bag once it was opened. App. 34, (USA 103). Inside the bag, I located two large shrink-wrapped, vacuum-sealed food saver bags that had bundles of U.S. currency which were concealed among the clothing. App. 24-25, (USA89-90). Photograph App. 24 (USA 89) is a true and accurate representation of the first bundle that was taken at that time in my presence and photograph App. 33, (USA 102) is a true and accurate representation of what I saw in the bag after the first bundle was removed, and photograph App. 25, (USA 90) is a true and accurate representation that shows the second bundle we discovered. These photographs App. 24, App. 25, App. 33 (USA 89, USA 90, USA 102) were taken in my presence. Inside each shrink-wrapped bundle were five rubber-banded bundles of U.S. currency for a total of ten rubber-banded bundles of U.S. currency. From my experience and training, I know that drug traffickers use the vacuum seal to conceal from law enforcement the narcotics odor from drug proceeds currency. I asked Clark why he sealed the currency in food-saver bags, and Clark did not respond. I asked Clark how he obtained such a large amount of currency, and Clark stated that he had been saving it for years and storing it in a safe at home. I know from my training and experience that drug traffickers will travel to source areas with large amounts of currency, such as what Clark was traveling with, in order to purchase narcotics at the source area and then ship or transport them back to originating city.

I asked Clark what the purpose of carrying such a large amount of U.S. currency, and Clark stated that he was going to buy semi-trucks in San Jose. I asked Clark if he had already selected a vehicle, and Clark stated that he had located the vehicles online. I asked Clark if he could show me the vehicles on his cellular telephone, and Clark responded that he "well I found several dealerships online." Clark admitted that he could not show any vehicles he intended to purchase; the only detail he could provide was that he liked Volvos. I asked Clark what was the purpose for purchasing vehicles in California, and Clark stated that he owned a trucking business, and Clark showed me a bank card with an LLC. I asked Clark why he was not purchasing the trucks for his business using his business account, and Clark did not answer. I also asked Clark why a narcotics K-9 alerted on his bag, and Clark responded that he did not know. Clark did not show anything to me anything related to the future purchase of any vehicles, any documentation on how he obtained the currency, or any explanation why the money was concealed in food-saver bags.

Clark was in possession two Samsung cellular telephones that had been placed on a nearby golf cart. I asked Clark if he had any photographs or text conversations related to the purchase or sale of narcotics on his telephones. Clark stated the did not. I asked Clark for consent to look through his telephones for evidence of vehicle purchase or drug trafficking, and Clark denied consent. I know from my training and experience that drug traffickers will travel with multiple cellular telephones to avoid law enforcement detection. Drug traffickers will usually focus the drug trafficking communications to one cellular telephone, while limiting their other phone for personal use.

I informed Clark that the U.S. currency and two Samsung cellular telephones would be seized as a result of the consent search. Clark provided no reaction when we informed him that

5

we were seizing the currency.  I provided Clark a DEA form for Receipt for Cash or Other Items for the seized currency and cellular telephones.  App. 172, (USA 1).  No weapons or controlled substances were found, and Clark was not arrested.  Following the seizure, TFO Thompson utilized K-9 "Duke" and the K-9 had a provided a positive alert for the presence of odor of narcotics on or about the U.S. currency that belonged to Clark.  I transferred the currency through DEA for safekeeping, App. 174-175, (USA 69-70), and on February 9, 2021, I transferred the money to Loomis for custody.  App. 173, (USA 2).  As part of the investigation, I ran a criminal history check from multiple databases and saw that Clark had convictions and arrests for a number of offenses, including obstruction, fleeing officer, carrying pistol without a license, multiple sale of marijuana, loitering for sex, possession with intent to distribute, trafficking illegal drugs, home invasion, cruelty to children, and possession of firearm by a felon.  App. 200-256, (USA112-168).

   Following the seizure, a search warrant was approved for the two telephones.  On June 3, 2021, I conducted an analysis of the data provided to me by Officer Abrams of one of the Samsung cellular telephones, the Galaxy A50 telephone, seized from Clark.  I reviewed the data on Cellebrite on our computer system.  In the data extracted from this device, numerous photos of large amounts of marijuana and other photographs zoomed in to show the quality of the marijuana.  App. 36-App. 37, App. 39, App. 41-46, (USA 91-92, USA 96, USA 106-USA111).  Photo App. 36, (USA 91) shows three glass jars filled with colorful marijuana.  I know from my training and experience that this type of marijuana has a higher demand in drug trafficking and is considered somewhat rare.  Other photographs show marijuana buds, App. 37, App. 39, App. 43, App. 45, (USA92, USA96, USA108, USA110), photograph App. 41, (USA106) is a large brick of marijuana, and App. 42, App. 44, App. 46, (USA 107, USA109, and USA111) are photographs of marijuana.  I know from my experience that photographs of buds are used by

drug traffickers to show the quality and characteristics of marijuana. In addition, the photographs here show the quality of the marijuana by zooming in on the "dust", which is common to facilitate drug transactions and pricing. In addition, the photographs of large bricks of marijuana are also indicative of drug trafficking. Marijuana is forbidden under the Controlled Substances Act. One photograph shows a package of Tetrahydrocannabinol (or THC) edibles labeled as "Medicated Nerds" to mimic the Nerds candy. App. 40, (USA 105). The package states "400MG THC PER ROPE" "SUPER POTENT FORMULA" and provides a warning to keep out of reach of children and animals. The package states "CA" meaning a product from California, the source area Clark was traveling to, assuming the product is not counterfeit. THC is not permitted by the Controlled Substances Act.

One other photograph I reviewed from Clark's telephone, dated January 22, 2021, showed a compressed rectangular-shaped brick of marijuana on a digital scale that showed a weight of 15.5 ounces. App. 38, (USA 93). I know from my experience and training that packages of marijuana arriving from source locations in California will often be vacuum-sealed and transported in this shape. In addition, these packages are typically 16 ounces or one pound in weight. This particular photograph was sent to Clark's telephone by a contact named "White Wayne." I also reviewed several messages between "White Wayne" and Clark indicating that Clark was consistently supplying "White Wayne" with multiple-pound quantities of marijuana. In the hours before "White Wayne" sent this photograph, it was observed that they had met up for narcotics transaction. In this particular situation, it appears that "White Wayne" weighed what he purchased from Clark and felt that he was owed an additional half-ounce of marijuana. Reviewing the data, I observed that the photograph of the marijuana brick (which only showed 15.5 ounces instead of 16 ounces/1 pound) USA93, is the image that "White Wayne" sent Clark and correlated with the following message complaining about the weight. "White Wayne" asked

Clark "do I need to weigh the other 1", indicating that at least two pounds of marijuana were purchased from Clark. Clark then text messaged "White Wayne" to answer the 1423 cellular telephone he was calling. The 1423 telephone number correlates with the Samsung A21 telephone number that was seized from Clark on February 3, 2021 that we were unable to extract data from. On a different transaction, in a text messaged dated January 26, 2021, "White Wayne" and Clark arrange a large transaction where "White Wayne" states that he had $5,000 and Clark responds that he will wait until "White Wayne" has the full $8,000. App. 50-91, (USA 178-219). These communications referring to drug trafficking were 1-2 weeks prior to his February 3, 2021 travel, which based on my training and experience further supports that the currency Clark was carrying was proceeds of drug trafficking and intended to purchase more narcotics.

    In addition, I reviewed two photographs of FedEx shipping receipts on Clark's telephone. The first receipt was dated December 30, 2020 with a shipping cost of $301.06 that was paid with cash. App. 170, (USA463). The items were shipped from Chico, CA to Clark's home address at 2330 Wingfoot Place, Decatur, GA. The package was addressed to "Anthony Huff" from a "Leroy Thomas." In my experience, drug traffickers will ship narcotics from a source area such as California to a recipient home residential locations in order to avoid law enforcement detection. I also know from my experience that marijuana shippers will also use fictitious names when addressing these packages in case they are intercepted by law enforcement. We learned in our investigation that this package was seized by the Decatur, GA Police Department for narcotics. See Declaration of Officer Freddy Saldana, Gwinnett Count, Georgia Police Department. App. 23. In the second FedEx shipping receipt, the items were shipped from the same location in Chico, California from "Leroy Thomas" to "Ann Stephens" at 4540 Janice Drive, College Park, GA. App. 169, (USA461). The cost of this shipment was

$146.79, which was also paid in cash.

I later reviewed additional text message conversations between Clark and other individuals. In one conversation with "Omri" in December 2020, he asked Clark for "two bags", which I know from my experience is narcotics code language for two pounds of marijuana. App. 94, (USA 222). Omri stated that he will buy the bags on the weekend. App. 95, (USA223). On December 11, 2020, Clark and Omri meet at a Publix supermarket to complete the transaction. App. 99, (USA227). Communications appear to show that Clark "fronted" the two pounds of marijuana to Omri to sell, and Clark asked for "bread", which means money, for one of the pounds of marijuana that was sold. App. 102, (USA230). Later communications appear to show that Omri did not pay Clark for the two pounds. App. 112, (USA240).

In a text communication that Clark has with another individual in May 2020, App. 113-App.118, (USA445-450), the subject asked Clark for "a zip or two", App. 113, (USA445), which I know from my experience means one or two ounces of marijuana. Later, the subject asked for "a half", which I know from my experience means a half-ounce of marijuana. App. 117, (USA449).

In a text communication between Clark and another individual in June 2020, the subject customer asked Clark if he can purchase a "half bag", which I know from my experience means a half-pound of marijuana plant/flower. App. 119, (USA459). Clark responded, "Ok let me know." App. 120, (USA 460).

In addition, there is a text communication between Clark and one of his marijuana suppliers. App. 121-126, (USA464-USA469). The communications took place between March 2020 and October 2020. In the communications, Clark stated that he needed "insides and deps." I know from my experience that "insides" means marijuana that is grown indoors, while "deps" means marijuana grown outdoors in a certain way (i.e. limited light). The supplier told Clark that the

insides would not be ready for six weeks, which means the marijuana needed additional time to grow. Based on my experience, I also understand that much of the conversation involves of negotiations between Clark and his supplier about the price of the marijuana in thousands of dollars. App. 122-126, (USA 465-469). For example, Clark wants to purchase deps for $1,250 to $1,500/pound, and Clark's supplier informs him it would be $2,000/pound. Clark tells his supplier that he can sell the pounds quickly in his city for $1,400 to $1,500/pound. App. 123, (USA466).

In a text communication with a contact saved as "Quincy," App. 127-131, (USA470-474), Clark messaged Quincy in October 2020 that he has "Gelato 41." App. 130, (USA473). Quincy appears to be Clark's customer. I know from my experience that Gelato 41 is a flower/plant of marijuana that is high in THC.

In another text communication with an unknown individual who is most likely a female, the subject asked Clark for marijuana. App. 132-App. 140, (USA475-USA483). The communications took place between March 2020 and October 2020. Clark responded, "How much you trying to spend", which appeared to offend the subject because she stated "Nvm" (or never mind) because she wanted it for free. App. 133, (USA476). The subject later asked Clark "What do you got to give? Money? Weed?". App. 135, (USA478). The subject later messaged Clark "Get me a half for my birthday." App. 136, (USA479). As I previously stated, I know from my experience that a "half" means a half-ounce of marijuana. Clark later messaged the subject that he had "OG" that is "strong and good", App. 139, (USA482), which I know from my experience means a high-grade marijuana flower.

In text communications in a time period between Mary 2020-September 2020 between Clark and another individual, the subject identifies as "June." App. 141-App.151, (USA484-USA494). In this conversation, June asked Clark that he has to visit California to see

"properties", which I know in this conversation means marijuana. There are several messages of high-quality properties, discussions about prices, and eventually Clark stated that he wants a price in "pounds." App. 147, (USA490). Clark told June that "they got them in LA 16", App. 149, (USA492), which I know from my experience means that Clark meant he can purchase that type of marijuana in Los Angeles for $1,600/pound.

In a text communication with another individual from May 2020 to February 2021, Clark is corresponding several times about drug transactions with what appears be his cousin. App. 152-App. 168, (USA495-USA511). In one message, the subject tells Clark that she is at a "trap." App. 153, (USA496). I know from my experience that "trap" is a "trap house", which is a location where illegal narcotics sales are conducted. In addition, the subject tells Clark that "OG" marijuana is selling slowly because it is "shaked up." App. 155, (USA498). I know from my experience that OG is a grade of marijuana and "shaked up" means it does not have large marijuana buds and that only small buds of the marijuana remain. Clark responded that he will "bring another one to give you also to blend out with the other", USA498, which from my experience means to add another pound to mix the good-sized marijuana buds with the "shake" from the old pound so it will sell better.

I declare under penalty of perjury, pursuant 28 USC § 1746, that the forgoing is true and correct.

Executed on April 4th, 2022

*[signature]*

Michael McBride